## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| F-Squared Investment Management, LLC, *et al.*, | Case No. 15-11469 (LSS) |
| Debtors. | |

| | |
|---|---|
| Craig Jalbert, in his Capacity as Trustee for F2 Liquidating Trust, | |
| vs. | |
| Adrienne Souza, | Adv. No. 17-50716 |
| Agnes Carol McClelland, | Adv. No. 17-50718 |
| Ann Aghababian, | Adv. No. 17-50719 |
| Charles Hart, | Adv. No. 17-50722 |
| Christine Martin, | Adv. No. 17-50723 |
| David Souza, | Adv. No. 17-50725 |
| Carlos Oliveira, | Adv. No. 17-50741 |
| David Alan Dunaway, | Adv. No. 17-50749 |
| F. Warren McFarlan, | Adv. No. 17-50752 |
| Geordie McClelland, | Adv. No. 17-50755 |
| George McClelland, | Adv. No. 17-50758 |
| Graham Hart, | Adv. No. 17-50767 |
| Hazel McClelland, | Adv. No. 17-50772 |
| Joseph Miskel, | Adv. No. 17-50776 |
| Jacquelyn McClelland, | Adv. No. 17-50786 |
| Kimberly Collins, | Adv. No. 17-50787 |
| John Chu, | Adv. No. 17-50791 |
| Leonard Gurevich, | Adv. No. 17-50793 |
| John M. Weyand 2005 Trust, | Adv. No. 17-50797 |
| Luiza Miranyan, | Adv. No. 17-50798 |
| John F. Holsteen Declaration of Trust, | Adv. No. 17-50799 |
| Jonathan Stern, | Adv. No. 17-50802 |
| Rodrigo Franco Toso, | Adv. No. 17-50819 |
| Zhenyu Yuan, | Adv. No. 17-50841 |
| Keith Jarrett, | Adv. No. 17-50848 |
| Lindsay Hart, | Adv. No. 17-50849 |
| Lindsay McClelland, | Adv. No. 17-50850 |

| | |
|---|---|
| McClelland Irrevocable Grantor Trust, | Adv. No. 17-50854 |
| Millennium Trust Company, LLC, | Adv. No. 17-50855 |
| MMF-NH LLC, | Adv. No. 17-50856 |
| Paul Martin, | Adv. No. 17-50858 |
| Quinn McClelland Hart, | Adv. No. 17-50859 |
| Revocable Trust of Charles E. Jacobs, | Adv. No. 17-50861 |
| Roberts Family 1998 Exempt Trust, | Adv. No. 17-50863 |
| Sea View Investments LLC, | Adv. No. 17-50865 |
| Thomas Roberts, | Adv. No. 17-50866 |
| Thomas Littauer, | Adv. No. 17-50870 |
| Tina Eng, | Adv. No. 17-50873 |
| William Weyand. | Adv. No. 17-50877 |

## OPINION

This is the second opinion addressing motions to dismiss complaints filed by the trustee of the F2 Liquidating Trust (the "Trustee" or "Plaintiff"). In the one hundred plus adversary proceedings filed by the Trustee, he seeks to avoid as fraudulent conveyances and/or preferential transfers bonus payments made by F-Squared Investment Inc. and/or tax and profit distributions made by F-Squared Management, LLC.

In my first opinion, I addressed the Trustee's per se theory of liability with respect to discretionary bonus payments. I rejected the Trustee's argument that discretionary bonuses without previously-enunciated metrics could never provide "value" for purposes of fraudulent conveyance laws and therefore granted the motions to dismiss challenging that theory. But I found the Trustee's allegations sufficient as to the insider status of certain Defendants, and permitted the preference counts, which otherwise went unchallenged by those defendants, to proceed.

In this opinion, I address a separate subset of motions to dismiss. Here, Defendants ask me to review the sufficiency of the allegations in the complaints regarding Debtors' financial condition relative to the challenged transfers. This opinion calls upon me to

2

decide what reasonable inferences can be drawn from the complaints. It also requires me to address the sufficiency of a novel and largely undeveloped theory: that F-Squared was "insolvent since its inception" because of violations of the securities law associated with the advertising of its AlphaSector Indexes.

I find the allegations in the complaints insufficient to support the requisite financial condition. And, I will not permit the excessive liberty taken in the Trustee's answering brief and unwarranted reply brief to add facts nowhere found in the complaints. Accordingly, I will grant the motions to dismiss. Whether the Trustee will be able to amend the complaints will await a properly-filed motion to amend.

*Background[1]*

F-Squared Management, LLC and its subsidiaries (collectively, "Debtors"[2]) were investment management and research firms whose primary business was selling Debtors' portfolio model services to investment advisors in the advisory, institutional, retail and retirement markets. In order to provide products and services, Debtors created and licensed a series of specialty indexes (the "AlphaSector Indexes"), covering a range of asset classes. The AlphaSector Indexes were based on sector rotation strategies that used quantitative models, programmed to measure the volatility and price movements of exchange-traded funds as criteria for inclusion and weighting in the indexes. As of June 30, 2014, there were

---

[1] As required on a motion to dismiss the facts recited herein are taken from the complaints and documents appropriately considered. *Pension Benefit Guar. Corp. v. White Consol. Indus., Inc.*, 998 F.2d 1192, 1196 (3d Cir. 1993). A court is not required to make findings of fact or conclusions of law on a motion to dismiss under Fed. R. Civ. P. 12, made applicable by Fed. R. Bankr. P. 7012, and I make none. *See* Fed. R. Civ. P. 52(a)(3), made applicable by Fed. R. Bankr. P. 7052.

[2] The debtors in these cases are: F-Squared Investment Management, LLC, F-Squared Investments, Inc., F-Squared Retirement Solutions, LLC, F-Squared Alternative Investments, LLC, F-Squared Solutions, LLC, F-Squared Institutional Advisors, LLC, F-Squared Capital, LLC, AlphaSector LLS GP 1, LLC, and Active Index Solutions, LLC.

approximately $28.5 billion in assets under advisement invested by Debtors' clients using the AlphaSector Indexes, including $13 billion in mutual fund assets sub-advised by Debtors.

F-Squared was organized as a limited liability company that paid no income taxes of its own.[3] Income taxes associated with F-Squared were instead paid on a ratable basis by each individual or entity with an ownership interest in F-Squared. In 2013, the Securities & Exchange Commission (the "SEC") began an investigation into potential violations of federal securities laws related to Debtors' advertising of the AlphaSector Indexes' performance track record between April 2001 and September 2008. On December 22, 2014, Debtors agreed to a settlement (the "Transfer Order") of an administrative cease-and-desist proceeding with the SEC that, among other things, required Debtors to admit to false advertising during the relevant time period, pay a $5 million penalty to the SEC, disgorge $30 million in related profits and adhere to certain future reporting and compliance requirements.

Following the entry of the Transfer Order, Debtors encountered various financial difficulties as a result of the negative publicity and the payment of the $35 million. A number of clients terminated their business relationships with Debtors, creating a sharp decrease in revenues. In response to the loss of business, Debtors instituted several cost-cutting measures, including a 30% reduction in Debtors' workforce. Specifically, in March 2015, Debtors reduced their workforce from 162 to 117 employees. As a result of the

---

[3] At least one of the F-Squared entities is organized as a corporation. Since no Defendant has moved to dismiss the Complaints because the Trustee's allegations fail to distinguish among debtor entities, I will accept as true that the relevant Debtor is a limited liability company for purposes of this Opinion. And, I will accept the parties' convention and refer to Debtors as F-Squared throughout this Opinion except when identifying the transferee of the challenged transfers.

reduction in workforce, Debtors incurred approximately $1.3 million in severance

obligations. Also, as a direct result of the SEC investigation, and in furtherance of the

eventual settlement under the Transfer Order, Debtors incurred an estimated $17.2 million

in direct legal fees, of which approximately $10 million was recovered through Debtors'

available insurance. The Trustee alleges that "millions more" were advanced to Debtors'

directors and officers for payment of legal fees related to the investigation.

*The Transfers*

Prior to the execution of the Transfer Order and in the two years leading up to the

filing of its bankruptcy petition, F-Squared Investment Management LLC made periodic

payments to Defendants so that each Defendant could pay income taxes on its F-Squared

equity interest (the "Tax Distributions"). Specifically, Tax Distributions were made on or

about August 29, 2013, December 5, 2013, March 27, 2014, April 8, 2014, June 5, 2014,

September 9, 2014 and March 30, 2015.[4] A "profit distribution" on account of an equity

---

[4] The majority of the listed dates for the Tax Distributions were taken from the Complaint filed against George McClelland in Adv. No. 17-50758, with the exception of the March 30, 2015 date that is taken from the Complaint against Leonard Gurevich in Adv. No. in 17-50793. The dates of distributions to other Defendants may vary by a day or two, but any discrepancy does not affect the outcome of these Motions to Dismiss. Defendants who received Tax Distributions are: Adrienne Souza (Adv. No. 17-50716), Agnes Carol McClelland (Adv. No. 17-50718), Ann Aghababian (Adv. No. 17-50719), Charles Hart (Adv. No. 17-50722), Christine Martin (Adv. No. 17-50723), David Souza (Adv. No. 17-50725), F. Warren McFarlan (Adv. No. 17-50752), Geordie McClelland (Adv. No. 17-50755), George McClelland (Adv. No. 17-50758), Graham Hart (Adv. No. 17-50767), Hazel McClelland (Adv. No. 17-50772), Jacquelyn McClelland (Adv. No. 17-50786), John Chu (Adv. No. 17-50791), John F. Holsteen Declaration of Trust (Adv. No. 17-50799), John M. Weyand 2005 Trust (Adv. No. 17-50797), Jonathan Stern (Adv. No. 17-50802), Joseph Miskel (Adv. No. 17-50776), Keith Jarrett (Adv. No. 17-50848), Leonard Gurevich (Adv. No. 17-50793), Lindsay Hart (Adv. No. 17-50849), Lindsay McClelland (Adv. No. 17-50850), Luiza Miranyan (Adv. No. 17-50498), McClelland Irrevocable Grantor Trust (Adv. No. 17-50854), Millennium Trust Company, LLC (Adv. No. 17-50855), MMF-NH LLC (Adv. No. 17-50856), Paul Martin (Adv. No. 17-50858), Quinn McClelland Hart (Adv. No. 17-50859), Revocable Trust of Charles E. Jacobs (Adv. No. 17-50861), Roberts Family 1998 Exempt Trust (Adv. No. 17-50863), Rodrigo Franco Toso (Adv. No. 17-50819), Sea View Investments LLC (Adv. No. 17-50865), Thomas Littauer (Adv. No. 17-50870), Thomas Roberts (Adv. No. 17-50866), Tina Eng (Adv. No. 17-50873), and William Weyand (Adv. No. 17-50877).

interest was also made to certain Defendants on or about January 16, 2014 ("Profits Distributions").[5] Also, on or about February 6, 2014, December 29, 2014, February 13, 2015 and April 15, 2015, F-Squared Investments Inc. paid certain Defendants bonuses[6] (the "Bonus Payments" and, with the Tax Distributions and the Profit Distributions, collectively, the "Transfers"). The Trustee contends that, as a result of Debtors' admitted securities law violations, Debtors were insolvent "since inception" and thus were insolvent on each day a transfer was made to any Defendant.

*Procedural Background*

On July 8, 2015, Debtors filed voluntary petitions under chapter 11 of title 11 of the United States Bankruptcy Code. Plaintiff Craig Jalbert was appointed the trustee for the F2 Liquidating Trust effective January 22, 2016, pursuant to Debtors' Joint Plan of Liquidation.

---

[5] As with the dates listed for the Tax Distributions, this date may vary by a day or two depending on the Defendant. Defendants who received a Profit Distribution are: Adrienne Souza (Adv. No. 17-50716), Agnes Carol McClelland (Adv. No. 17-50718), Ann Aghababian (Adv. No. 17-50719), Charles Hart (Adv. No. 17-50722), Christine Martin (Adv. No. 17-50723), David Souza (Adv. No. 17-50725), F. Warren McFarlan (Adv. No. 17-50752), Geordie McClelland (Adv. No. 17-50755), George McClelland (Adv. No. 17-50758), Graham Hart (Adv. No. 17-50767), Hazel McClelland (Adv. No. 17-50772), Jacquelyn McClelland (Adv. No. 17-50786), John Chu (Adv. No. 17-50791), John F. Holsteen Declaration of Trust (Adv. No. 17-50799), John M. Weyand 2005 Trust (Adv. No. 17-50797), Jonathan Stern (Adv. No. 17-50802), Joseph Miskel (Adv. No. 17-50776), Keith Jarrett (Adv. No. 17-50848), Lindsay Hart (Adv. No. 17-50849), Lindsay McClelland (Adv. No. 17-50850), McClelland Irrevocable Grantor Trust (Adv. No. 17-50854), Millennium Trust Company, LLC (Adv. No. 17-50855), MMF-NH LLC (Adv. No. 17-50856), Paul Martin (Adv. No. 17-50858), Quinn McClelland Hart (Adv. No. 17-50859), Revocable Trust of Charles E. Jacobs (Adv. No. 17-50861), Sea View Investments LLC (Adv. No. 17-50865), Thomas Littauer (Adv. No. 17-50870), Tina Eng (Adv. No. 17-50873), William Weyand (Adv. No. 17-50877) and Kimberly Collins (Adv. No. 17-50787). Additionally, on October 30, 2014, F-Squared Investment Management, LLC also repurchased its own stock from George McClelland in exchange for $86,184.

[6] These dates, too, may vary by a couple of days, depending on the Defendant. Defendants who received Bonus Payments are: Carlos Oliveira (Adv. No. 17-50741), David Alan Dunaway (Adv. No. 17-50749), Leonard Gurevich (Adv. No. 17-50793), George McClelland (Adv. No. 17-50758), Joseph Miskel (Adv. No. 17-50776), Luiza Miranyan (Adv. No. 17-50498), Rodrigo Franco Toso (Adv. No. 17-50819), Zhenyu Yuan (Adv. No. 17-50841) and Kimberly Collins (Adv. No. 17- 50787).

On July 17, 2017, the Trustee filed complaints (the "Complaints") against each

Defendant seeking recovery of Bonus Payments, Tax Distributions and/or Profit

Distributions as constructive fraudulent transfers and/or preferential transfers.

*The McClelland Defendants*

On November 7, 2017, Defendants Agnes Carol McClelland, Ann Aghababian,

Charles Hart, Geordie McClelland, George McClelland, Graham Hart, Hazel McClelland,

Jacquelyn McClelland, Lindsay Hart, Lindsay McClelland, the McClelland Irrevocable

Grantor Trust and Quinn McClelland Hart (the "McClelland Defendants") jointly filed

their Motion to Dismiss, together with their opening brief.[7]  On December 22, 2017, the

Trustee filed an answering brief.[8]  The McClelland Defendants' reply brief was filed on

January 19, 2018.[9]  On January 25, 2018, the Trustee filed a motion for leave to file a sur-

reply accompanied by his sur-reply brief.[10]  The McClelland Defendants did not oppose the

---

[7] Motion to Dismiss Adversary Proceeding & Memorandum in Support of Motion to Dismiss, Adv. No. 17-50718, D.I. 13, 14; Adv. No. 17-50719, D.I. 13, 14; Adv. No. 17-50722, D.I. 13, 14; Adv. No. 17-50755, D.I. 13, 14; Adv. No. 17-50758, D.I. 13, 14; Adv. No. 17-50767, D.I. 13, 14; Adv. No. 17-50772, D.I. 13, 14; Adv. No. 17-50786, D.I. 13, 14; Adv. No. 17-50849, D.I. 13, 14; Adv. No. 17-50850, D.I. 13, 14; Adv. No. 17-50854, D.I. 13, 14; Adv. No. 17-50859, D.I. 13, 14 (the "McClelland Opening Brief").

[8] Trustee's Memorandum in Opposition to Defendants' Motion to Dismiss, Adv. No. 17-50718, D.I. 30; Adv. No. 17-50719, D.I. 30; Adv. No. 17-50722, D.I. 30; Adv. No. 17-50755, D.I. 30; Adv. No. 17-50758, D.I. 30; Adv. No. 17-50767, D.I. 29; Adv. No. 17-50772, D.I. 30; Adv. No. 17-50786, D.I. 30; Adv. No. 17-50849, D.I. 30; Adv. No. 17-50850, D.I. 30; Adv. No. 17-50854, D.I. 30; Adv. No. 17-50859, D.I. 30.  In each of Defendants' cases, the Trustee filed substantially similar answering briefs.  I will refer to all of these (across all groups of Defendants) as the "Answering Brief," collectively.

[9] Reply in Support of Motion to Dismiss, Adv. No. 17-50718, D.I. 35; Adv. No. 17-50719, D.I. 35; Adv. No. 17-50722, D.I. 35; Adv. No. 17-50755, D.I. 35; Adv. No. 17-50758, D.I. 35; Adv. No. 17-50767, D.I. 34; Adv. No. 17-50772, D.I. 35; Adv. No. 17-50786, D.I. 35; Adv. No. 17-50849, D.I. 35; Adv. No. 17-50850, D.I. 35; Adv. No. 17-50854, D.I. 35; Adv. No. 17-50859, D.I. 34 (the "McClelland Reply Brief").

[10] Motion for Leave to File Sur-Reply to Defendants' Reply in Support of Their Motion to Dismiss Complaint, Adv. No. 17-50718, D.I. 36; Adv. No. 17-50719, D.I. 36; Adv. No. 17-50722, D.I. 36; Adv. No. 17-50755, D.I. 36; Adv. No. 17-50758, D.I. 36; Adv. No. 17-50767, D.I. 35; Adv. No. 17-50772, D.I. 36; Adv. No. 17-50786, D.I. 36; Adv. No. 17-50849, D.I. 36; Adv. No. 17-50850, D.I. 36; Adv. No. 17-50854, D.I. 36; Adv. No. 17-50859, D.I. 36.

motion for leave to file a sur-reply, and the motion was granted upon filing of a certification of counsel.[11] The sur-reply was filed on March 9, 2018.[12]

*The Passive Investor Defendants*

On November 13, 2017, Defendants Adrienne Souza, Christine Martin, David Souza, F. Warren McFarlan, John M. Weyand 2005 Trust, John F. Holsteen Declaration of Trust, Jonathan Stern, Keith Jarrett, Millennium Trust Company, LLC, MMF-NH LLC, Paul Martin, Revocable Trust of Charles E. Jacobs, Roberts Family 1998 Exempt Trust, Sea View Investments LLC, Thomas Roberts, Thomas Littauer, and William Weyand (the "Passive Investor Defendants") jointly filed their Motion to Dismiss, together with their opening brief.[13] On December 22, 2017, the Trustee filed an answering brief.[14] The Passive Investor Defendants' reply brief was filed on January 18, 2018.[15] On January 25, 2018, the

---

[11] Order Granting Motion of Craig Jalbert for Leave to File Sur-Reply to Defendants' Reply in Support of Their Motion to Dismiss Complaint, Adv. No. 17-50718, D.I. 40; Adv. No. 17-50719, D.I. 40; Adv. No. 17-50722, D.I. 40; Adv. No. 17-50755, D.I. 40; Adv. No. 17-50758, D.I. 40; Adv. No. 17-50767, D.I. 39; Adv. No. 17-50772, D.I. 40; Adv. No. 17-50786, D.I. 40; Adv. No. 17-50849, D.I. 40; Adv. No. 17-50850, D.I. 40; Adv. No. 17-50854, D.I. 40; Adv. No. 17-50859, D.I. 39.

[12] Trustee's Sur-Reply in Opposition to Motion to Dismiss, Adv. No. 17-50718, D.I. 41; Adv. No. 17-50719, D.I. 41; Adv. No. 17-50722, D.I. 41; Adv. No. 17-50755, D.I. 41; Adv. No. 17-50758, D.I. 41; Adv. No. 17-50767, D.I. 40; Adv. No. 17-50772, D.I. 41; Adv. No. 17-50786, D.I. 41; Adv. No. 17-50849, D.I. 41; Adv. No. 17-50850, D.I. 41; Adv. No. 17-50854, D.I. 41; Adv. No. 17-50859, D.I. 40.

[13] Defendants' Motion to Dismiss Complaint & Joint Memorandum in Support of Defendants' Motion to Dismiss, Adv. No. 17-50716, D.I. 18, 19; Adv. No. 17-50723, D.I. 17, 18; Adv. No. 17-50725, D.I. 17, 18; Adv. No. 17-50752, D.I. 17, 18; Adv. No. 17-50797, D.I. 17, 18; Adv. No. 17-50799, D.I. 17, 18; Adv. No. 17-50802, D.I. 17, 18; Adv. No. 17-50848, D.I. 17, 18; Adv. No. 17-50855, D.I. 17, 18; Adv. No. 17-50856, D.I. 17, 18; Adv. No. 17-50858, D.I. 17, 18; Adv. No. 17-50861, D.I. 17, 18; Adv. No. 17-50863, D.I. 17, 18; Adv. No. 17-50865, D.I. 17, 18; Adv. No. 17-50866, D.I. 17, 18; Adv. No. 17-50870, D.I. 17, 18; Adv. No. 17-50877, D.I. 17, 18.

[14] Trustee's Memorandum in Opposition to Defendant's Motion to Dismiss, Adv. No. 17-50716, D.I. 33; Adv. No. 17-50723, D.I. 33; Adv. No. 17-50725, D.I. 33; Adv. No. 17-50752, D.I. 33; Adv. No. 17-50797, D.I. 33; Adv. No. 17-50799, D.I. 33; Adv. No. 17-50802, D.I. 33; Adv. No. 17-50848, D.I. 33; Adv. No. 17-50855, D.I. 33; Adv. No. 17-50856, D.I. 33; Adv. No. 17-50858, D.I. 33; Adv. No. 17-50861, D.I. 33; Adv. No. 17-50863, D.I. 33; Adv. No. 17-50865, D.I. 33; Adv. No. 17-50866, D.I. 33; Adv. No. 17-50870, D.I. 33; Adv. No. 17-50877, D.I. 33.

[15] Defendants' Reply in Support of Their Motion to Dismiss Complaint, Adv. No. 17-50716, D.I. 36; Adv. No. 17-50723, D.I. 36; Adv. No. 17-50725, D.I. 37; Adv. No. 17-50752, D.I. 37; Adv. No.

Trustee filed a motion for leave to file a sur-reply accompanied by his sur-reply brief.[16]  The

Passive Investor Defendants opposed the motion to file a sur-reply.[17]  The opposition will be

sustained.

*The New Jersey Defendants*

On November 17, 2017, Defendants Dunaway, Gurevich, Miranyan, Miskel,

Oliveira, Toso and Yuan (the "New Jersey Defendants") jointly filed their Motion to

---

17-50797, D.I. 37; Adv. No. 17-50799, D.I. 37; Adv. No. 17-50802, D.I. 37; Adv. No. 17-50848, D.I. 37; Adv. No. 17-50855, D.I. 37; Adv. No. 17-50856, D.I. 37; Adv. No. 17-50858, D.I. 37; Adv. No. 17-50861, D.I. 37; Adv. No. 17-50863, D.I. 37; Adv. No. 17-50865, D.I. 37; Adv. No. 17-50866, D.I. 37; Adv. No. 17-50870, D.I. 37; Adv. No. 17-50877, D.I. 37.

[16] Motion for Leave to File Sur-Reply to Defendants' Reply in Support of Their Motion to Dismiss Complaint, Adv. No. 17-50716, D.I. 40; Adv. No. 17-50723, D.I. 40; Adv. No. 17-50725, D.I. 40; Adv. No. 17-50752, D.I. 40; Adv. No. 17-50797, D.I. 40; Adv. No. 17-50799, D.I. 40; Adv. No. 17-50802, D.I. 40; Adv. No. 17-50848, D.I. 40; Adv. No. 17-50855, D.I. 40; Adv. No. 17-50856, D.I. 40; Adv. No. 17-50858, D.I. 40; Adv. No. 17-50861, D.I. 40; Adv. No. 17-50863, D.I. 40; Adv. No. 17-50865, D.I. 40; Adv. No. 17-50866, D.I. 40; Adv. No. 17-50870, D.I. 40; Adv. No. 17-50877, D.I. 40.

[17] Objection to Plaintiff's Motion for Leave to File Sur-Reply, Adv. No. 17-50716, D.I. 42; Adv. No. 17-50723, D.I. 42; Adv. No. 17-50725, D.I. 42; Adv. No. 17-50752, D.I. 42; Adv. No. 17-50797, D.I. 42; Adv. No. 17-50799, D.I. 42; Adv. No. 17-50802, D.I. 42; Adv. No. 17-50848, D.I. 42; Adv. No. 17-50855, D.I. 42; Adv. No. 17-50856, D.I. 42; Adv. No. 17-50858, D.I. 42; Adv. No. 17-50861, D.I. 42; Adv. No. 17-50863, D.I. 42; Adv. No. 17-50865, D.I. 42; Adv. No. 17-50866, D.I. 42; Adv. No. 17-50870, D.I. 42; Adv. No. 17-50877, D.I. 42.

Dismiss, together with their opening brief.[18]  On December 22, 2017, the Trustee filed an

answering brief.[19]  The New Jersey Defendants' reply brief was filed on January 19, 2018.[20]

*Defendant Chu*

On November 17, 2017, Defendant John Chu filed his Motion to Dismiss together

with an opening brief.[21]  On December 22, 2017, the Trustee filed his answering brief.[22]  Mr.

Chu filed his reply brief on January 19, 2018.[23]  On January 25, 2018, the Trustee filed a

motion for leave to file a sur-reply accompanied by a sur-reply brief.[24]  Mr. Chu did not

oppose the motion for leave to file a sur-reply, and the motion was granted upon filing of a

certification of counsel.[25]  The sur-reply was filed on March 9, 2018.[26]

---

[18] Motion to Dismiss Complaints for Failure to State a Claim Pursuant to Federal Rule of
Bankruptcy Procedure, Rule 7012 and Federal Rule of Procedure 12(b)(6) of David Alan Dunaway,
Leonard Gurevich, Luiza Miranyan, Joseph Miskel, Carlos Oliveria, Rodrigo Franco Toso, And
Zhenyu Yuan, Adv. No. 17-50749, D.I. 18; Adv. No. 17-50793, D.I. 18; Adv. No. 17-50798, D.I.
18; Adv. No. 17-50776, D.I. 18; Adv. No. 17-50741, D.I. 18; Adv. No. 17-50819, D.I. 18; Adv. No.
17-50841, D.I. 18. Opening Brief of David Alan Dunaway, Leonard Gurevich, Luiza Miranyan,
Joseph Miskel, Carlos Oliveria, Rodrigo Franco Toso, And Zhenyu Yuan in Support of Motion to
Dismiss Complaints for Failure to State a Claim Pursuant to Federal Rule of Bankruptcy Procedure,
Rule 7012 and Federal Rule of Procedure 12(b)(6), Adv. No. 17-50749, D.I. 19; Adv. No. 17-50793,
D.I. 19; Adv. No. 17-50798, D.I. 19; Adv. No. 17-50776, D.I. 19; Adv. No. 17-50741, D.I. 19; Adv.
No. 17-50819, D.I. 19; Adv. No. 17-50841, D.I. 19 (the "New Jersey Defendants Opening Brief").
[19] Trustee's Memorandum in Opposition to Defendants' Motion to Dismiss, Adv. No. 17-50749,
D.I. 39; Adv. No. 17-50793, D.I. 38; Adv. No. 17-50798, D.I. 39; Adv. No. 17-50776, D.I. 39; Adv.
No. 17-50741, D.I. 39; Adv. No. 17-50839, D.I. 39; Adv. No. 17-50841, D.I. 39.
[20] Reply to Trustee's Memorandum in Opposition to Defendants' Motion to Dismiss Filed on Behalf
of David Alan Dunaway, Leonard Gurevich, Luiza Miranyan, Joseph Miskel, Rodrigo Franco
Toso, Carlos Oliveira and Zhenyu Yuan, Adv. No. 17-50749, D.I. 43; Adv. No. 17-50793, D.I. 42;
Adv. No. 17-50798, D.I. 43; Adv. No. 17-50776, D.I. 43; Adv. No. 17-50741, D.I. 43; Adv. No. 17-
50839, D.I. 43; Adv. No. 17-50841, D.I. 43.
[21] Defendant's Motion to Dismiss, Adv. No. 17-50791, D.I. 14; Opening Brief in Support of
Defendant's Motion to Dismiss, Adv. No. 17-50791, D.I. 15.
[22] Trustee's Memorandum in Opposition to Defendant's Motion to Dismiss, Adv. No. 17-50873,
D.I. 30.
[23] Reply Brief in Support of Defendant's Motion to Dismiss, Adv. No. 17-50791, D.I. 35.
[24] Motion for Leave to File Sur-Reply to Defendants' Reply in Support of Their Motion to Dismiss
Complaint, Adv. No. 17-50791, D.I. 36.
[25] Order Granting Motion of Plaintiff Craig Jalbert, Trustee of the F2 Liquidation Trust, for Leave
to File Sur-Reply to Defendants' Reply in Support of Their Motion to Dismiss Complaint, Adv. No.
17-50791, D.I. 40.
[26] Trustee's Sur-Reply in Opposition to Motion to Dismiss, Adv. No. 17-50873, D.I. 41.

*Defendant Eng*

On November 17, 2017, Defendant Tina Eng filed her Motion to Dismiss together with an opening brief.[27]  On December 22, 2017, the Trustee filed his answering brief.[28]  Ms. Eng filed her reply brief on January 19, 2018.[29]  On January 25, 2018, the Trustee filed a motion for leave to file a sur-reply accompanied by a sur-reply brief.[30]  Ms. Eng did not oppose the motion for leave to file a sur-reply, and the motion was granted upon filing of a certification of counsel.[31]  The sur-reply was filed on March 9, 2018.[32]

*Defendant Collins*

On November 30, 2017, Defendant Kimberly Collins filed her Motion to Dismiss together with an opening brief.[33]  On December 22, 2017, the Trustee filed his answering brief.[34]  Ms. Collins filed her reply brief on January 19, 2018.[35]  On January 25, 2018, the Trustee filed a motion for leave to file a sur-reply accompanied by a sur-reply brief.[36]

---

[27] Defendant's Motion to Dismiss, Adv. No. 17-50873, D.I. 14; Opening Brief in Support of Defendant's Motion to Dismiss, Adv. No. 17-50873, D.I. 15.

[28] Trustee's Memorandum in Opposition to Defendant's Motion to Dismiss, Adv. No. 17-50873, D.I. 30.

[29] Reply Brief in Support of Defendant's Motion to Dismiss, Adv. No. 17-50873, D.I. 34.

[30] Motion for Leave to File Sur-Reply to Defendants' Reply in Support of Their Motion to Dismiss Complaint, Adv. No. 17-50873, D.I. 35.

[31] Order Granting Motion of Plaintiff Craig Jalbert, Trustee of the F2 Liquidation Trust, for Leave to File Sur-Reply to Defendants' Reply in Support of Their Motion to Dismiss Complaint, Adv. No. 17-50873, D.I. 39.

[32] Trustee's Sur-Reply in Opposition to Motion to Dismiss, Adv. No. 17-50873, D.I. 40.

[33] Motion to Dismiss, Adv. No. 17-50787, D.I. 15; Memorandum in Support of Motion to Dismiss, Adv. No. 17-50787, D.I. 15-1.

[34] Trustee's Memorandum of Law in Opposition to Defendant's Motion to Dismiss, Adv. No. 17-50787, D.I. 32.

[35] Defendant's Reply to Plaintiff's Opposition to Motion to Dismiss, Adv. No. 17-50787, D.I. 36.

[36] Motion of Plaintiff Craig Jalbert, Trustee of the F2 Liquidating Trust, for Leave to file Sur-Reply to Reply Brief in Support of Defendants' Motion to Dismiss, Adv. No. 17-50787, D.I. 37.

Ms. Collins did not oppose the motion for leave to file a sur-reply, and the motion was granted upon filing of a certification of counsel.[37] The sur-reply was filed on April 3, 2018.[38]

*Oral Argument*

I heard oral argument on March 12, 2019.[39] Defendants coordinated their argument on F-Squared's financial condition and each Defendant adopted the contentions proffered by counsel who took the laboring oar at the hearing.[40] Further, the parties used the Complaint filed against George McClelland[41] when referring to allegations in the Complaints. Accordingly, except where otherwise indicated, I will do the same.[42] At the conclusion of the argument, I took the matter under advisement.

*Jurisdiction*

Subject matter jurisdiction exists over these adversary proceedings pursuant to 28 U.S.C. § 1334(b). Adversary proceedings seeking to avoid fraudulent conveyances and preferences are statutorily core matters.[43]

As to my entry of final judgments in these Adversary Proceedings, Plaintiff consents.[44] Defendants take varying positions. The New Jersey Defendants consent to my entry of final orders.[45] The McClelland Defendants do not consent to the entry of final

---

[37] Order Granting Motion of Plaintiff Craig Jalbert, Trustee of the F2 Liquidating Trust, for Leave to file Sur-Reply to Reply Brief in Support of Defendants' Motion to Dismiss, Adv. No. 17-50787, D.I. 40.
[38] Trustee's Sur-Reply in Opposition to Motion to Dismiss, Adv. No. 17-50787, D.I. 42.
[39] *See* Hr'g Tr., Mar. 12, 2019, No. 15-11469, D.I. 1262.
[40] Hr'g Tr. 23:25-24:1, 24:10-12, 26:12-14, 26:18-19.
[41] Adv. No. 17-50758.
[42] While the paragraph numbering in the Complaints or other responsive briefing in the other adversary proceedings may differ slightly, except where otherwise specified, each of the Trustee's filings against the various Defendants contains paragraphs with identical wording.
[43] 28 U.S.C. § 157(b)(2)(F), (H).
[44] Complaint ¶ 4.
[45] New Jersey Defendants Opening Brief 4.

orders or judgments if it is determined that, absent consent of the parties, the bankruptcy court cannot enter final orders or judgments consistent with Article III of the Constitution.[46] The Passive Investor Defendants take an intermediate position, stating that they consent to the entry of final orders or judgments "in connection with this Motion but reserve their right to seek a jury trial before an Article III judge."[47] So, too, both Mr. Chu and Ms. Eng consent to the entry of final orders or judgments in connection "with this Motion."[48] Ms. Collins did not make a statement regarding final judgments, accordingly (unless otherwise ordered by the court) she has waived the right to contest my authority to enter final orders.[49]

Accordingly, I may enter final orders on these Motions to Dismiss consistent with the Constitution with respect to the Plaintiff, the New Jersey Defendants, the Passive Investor Defendants, Mr. Chu, Ms. Eng and Ms. Collins. Whether I may do so with respect to the McClelland Defendants is an open issue, and one that has not been briefed. Because I will allow the Trustee to file a motion for leave to amend, however, the order entered with respect to the McClelland Defendants on this motion will not be a final order.[50]

*Parties' Positions*

Defendants move to dismiss the Complaints for failure to sufficiently allege (i) insolvency, (ii) unreasonably small capital or (iii) intent to incur debts that F-Squared could not pay.

---

[46] McClelland Motion to Dismiss 2.

[47] Passive Investor Motion to Dismiss 2.

[48] Chu Motion to Dismiss 2; Eng Motion to Dismiss 2.

[49] Del. Bankr. L.R. 7012-1.

[50] Unless a non-consenting entity briefs the issue of authority to enter a final order on a given matter, a statement that a party does not consent if the court cannot enter final orders absent consent of the parties is of little value. If the McClelland Defendants believe that I cannot enter a final order in their respective Adversary Proceedings, they should brief the issue in a future filing.

As to insolvency, all Defendants argue that the relevant standard is balance sheet insolvency, that the Trustee has not pled any information on Debtors' assets and liabilities at the time of the transfers, or at any time, and so the Complaints should be dismissed. Defendants further assert that the Trustee's theory that Debtors are "insolvent from the inception" of the AlphaSector Index products is conclusory and contradicted by other allegations in the Complaints or First Day Declaration.[51]  Further, Defendants assert that "insolvency from the inception" is not a valid legal theory, and mischaracterizes even the minimal facts pled.  The Trustee responds first that insolvency is a factual question that is inappropriate for resolution on a motion to dismiss.  He contends that the facts in the Complaints, in particular the allegations of fraud, are sufficient to plead insolvency.  He also contends that Debtors' December 2014 admission of securities law violations can be used to show that Debtors were insolvent on the date of each transfer.  Defendants respond that to do so would be employing impermissible hindsight.

As to "unreasonably small capital," Defendants generally assert that the allegations in the Complaints supporting this contention are few and far between.  For those allegations that may be read to support a theory of undercapitalization, Defendants contend that the Trustee cannot meet the standard of "reasonable foreseeability" without relying on impermissible hindsight.  In response, the Trustee argues first that F-Squared was "always undercapitalized" because "[e]ven though F-Squared generated large quantities of cash during and after its fraudulent advertising campaign, this cash flow slowed to a trickle once F-Squared admitted to its fraud, and the company used much of the cash it had in its coffers

---

[51] Declaration of David N. Phelps in Support of Chapter 11 Petitions and First Day Motions, Jul. 8, 2015, No. 15-11469, D.I. 3.

14

to make the Transfers."[52]  Additionally, the Trustee asserts that he has not relied on
impermissible hindsight, and that Defendants have conflated "hindsight" with permissible
use of subsequently-acquired information.

As to F-Squared's intent to incur debts it cannot pay, Defendants generally note that
there are not facts to support this claim in the Complaints beyond the Trustee's recitation of
the statute.  Certain Defendants also point out that the First Day Declaration (which the
Trustee purports to incorporate by reference into the Complaints) indicates Debtors held an
ongoing belief that the company would continue on after the Transfer Order without the
need to file for bankruptcy, and therefore no intent or belief of inability to pay debts exists.
The Trustee's responsive briefing does not address Defendants' arguments.

### Legal Standard

A Rule 12(b)(6) motion is a challenge to the sufficiency of factual allegations in a
complaint.[53]  In reviewing a complaint under Rule 12(b)(6), the Third Circuit has instructed
that the factual and legal elements of a claim should first be separated.[54]  The court must
accept all of the complaint's well-pled facts as true but may disregard legal conclusions.[55]  A
court must then determine whether the facts alleged in the complaint are sufficient to show
that the plaintiff has a "plausible claim for relief."[56]

A plausible claim requires more than allegations of the plaintiff's entitlement to relief;
a complaint has to "show" such an entitlement with its facts.[57]  It is insufficient to provide

---

[52] Answering Brief ¶ 53.
[53] *In re Amcad Holdings, LLC*, 579 B.R. 33, 37 (Bankr. D. Del. 2017) (citing to *Kost v. Kozakiewicz*, 1 F.3d 176, 183 (3d Cir. 1993)).
[54] *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210-11 (3d Cir. 2009).
[55] *Id.* (citing *Ashcroft v. Iqbal*, 556 U.S. 662, 677 (2009)).
[56] *See In re THQ, Inc.*, No. 12-13398, 2016 WL 1599798, at *2 (Bankr. D. Del. Apr. 18, 2016).
[57] *Fowler*, 578 F.3d at 210 (citing *Iqbal*, 556 U.S. at 677 (2009)).

"threadbare recitals of a cause of action's elements, supported by mere conclusory statements[.]"[58]  Instead, a complaint "must contain either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory."[59]  This allows the court to "draw the reasonable inference that the defendant is liable for the misconduct alleged."[60]  The plausibility determination will be "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense."[61]  A court must draw all reasonable inferences from the facts in the light most favorable to the plaintiff.[62]

*Discussion*

I.    **On These Motions to Dismiss, I Will Consider Only the Facts Alleged in the Complaints and the Transfer Order.**

Before examining the substance of the Motions to Dismiss, it is important to determine what facts and documents I will consider—or, more importantly, not consider—in examining the sufficiency of the Trustee's allegations.

First, I will not consider the numerous new facts the Trustee alleges in his Answering Brief.  As each Defendant argues, "it is axiomatic that the complaint may not be amended by the briefs in opposition to a motion to dismiss."[63]  Accordingly, a court must not "consider after-the-fact allegations in determining the sufficiency" of a complaint under

---

[58] *THQ Inc.*, 2016 WL 1599798, at *2 (citing *Iqbal*, 556 U.S. at 677).
[59] *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 562 (2007).
[60] *Fowler*, 578 F.3d at 210 (citing *Iqbal*, 556 U.S. at 677 (2009)).
[61] *Id.*
[62] *Phillips v. Cty. of Allegheny*, 515 F.3d 224, 228 (3d Cir. 2008).
[63] *Com. of Pa. ex rel. Zimmerman v. PepsiCo, Inc.*, 836 F.2d 173, 181 (3d Cir. 1988).

Rule 12(b)(6).[64] Attempting to preempt the argument that the Answering Brief added new facts, the Trustee states:

> The great majority of the facts below [in the Answering Brief] can be found in the Complaints, in the Declaration of David N. Phelps in Support of Chapter 11 Petitions and First Day Motions incorporated into the Complaints by reference at ¶ 11, the Transfer Order referenced in the Complaints at ¶ 15, and the SEC complaint referenced in the Complaints at ¶ 16 (of which the Court can take judicial notice). Some additional facts were derived from additional information obtained by the Trustee.[65]

Looking to the listed sources (assuming I should even do so), try as I might, I could not find the new facts relevant to F-Squared's financial condition in any of them.[66] Rather, the Answering Brief reads like an entirely new complaint, complete with new factual allegations.

In his Answering Brief, the Trustee for the first time alleges: (i) aggregate and yearly fees received for the use and licensing of the AlphaSector Indexes; (ii) statutory penalties that the SEC may assess for each violation of the securities laws; (iii) allegations regarding F-Squared's contracts with clients which allegedly include indemnification clauses; and (iv) a discussion of the proofs of claims filed against F-Squared together with a thirteen-page chart listing 94 proofs of claim ("Proof of Claim Chart").[67] The Trustee asserts that the

---

[64] *In re Washington Mut., Inc.*, 418 B.R. 107, 113 (Bankr. D. Del. 2009) (quoting *Frederico v. Home Depot*, 507 F.3d 188, 201–02 (3d Cir.2007)).

[65] Answering Brief ¶ 7 n.5.

[66] Perhaps some of this information is in the "SEC complaint." *See* Complaint ¶ 16. Paragraph 16 states in its entirety: "On the same day, the SEC also commenced a civil action against Howard Present, who had been the CEO of F-Squared until his departure in November 2014." The "SEC complaint" was not attached as an exhibit to the Complaints, nor relied on in the Complaints in any sense – as Paragraph 16 seems to be the only reference to the action against Mr. Present. And, as no party to these adversary proceedings provided me with a copy of the "SEC complaint" in connection with the Motions to Dismiss, I have not reviewed it.

[67] *See* Answering Brief Ex. A.

Proof of Claim Chart reflects claims against F-Squared based on indemnification obligations

and liabilities arising under tort or contract because of F-Squared's fraud.

As became clear during oral argument, these newly-identified potential SEC fines as

well as the indemnification claims are at the heart of the Trustee's arguments. But there is

no mention in the Complaints of any such indemnification claims arising from F-Squared's

contracts with its clients. While the Trustee suggested at argument that I may be able to

infer the existence of such obligations, such an inference is not reasonable.[68] Thus, I will not

---

[68] At oral argument, the Trustee conceded that the indemnification claims are not mentioned specifically in the Complaints, although it was initially suggested that such claims could be inferred from the facts.

> MR. MOXLEY: So, we talk at paragraph 20, Judge, about how the SEC opened investigation into the clients. We don't say in the complaint specifically that those investigations led to indemnification claims. We don't say that specifically, Judge, but it is a fair inference that the court can make.
> THE COURT: Why can I make an inference about what someone's indemnification obligations are to another party?
> MR. MOXLEY: It's one piece, Judge. It's just one piece of the overall. The cases speak to the fact that the complaint is to be and the financial situation of the company is to be looked at in its totality. This is just one aspect. I have more I'm going through, but this is just one aspect of the liability that F-Squared was facing. We know it faced the securities violation.
> THE COURT: Where in this paragraph do you say that F-Squared faced liability from indemnification obligations?
> MR. MOXLEY: Your Honor, we don't expressly say it in that paragraph.

Hr'g Tr. 35:16-36:11. The Trustee later conceded that the facts did not compel an inference of the existence of such indemnification agreements.

> MR. MOXLEY: Yeah what you can infer from those facts is that there were multiple clients which, of course, would have had to have been contacted and provided with information about the indexes. I think that's a fair inference. And each and every time that happened, there was a securities fraud violation. And an indemnification claim obligation and breach of contract.
> THE COURT: Why should I assume there's an indemnification obligation from that?
> MR. MOXLEY: I apologize. I don't you have to assume the indemnification piece, but you do have, I think, the court respectfully does have to infer that there were multiple clients who were contacted

consider any indemnification obligations to F-Squared's clients on these Motions to Dismiss.

Additionally, the Trustee and certain Defendants ask me to consider various documents attached as exhibits to a filing or referenced in a filing. As for the Trustee's requests, the only exhibits attached to the Complaints relating to F-Squared's financial condition are the exhibits detailing the individual transfers.[69] I will consider these as they detail relevant facts and are simply an extension of the Complaints. I will not consider the Proof of Claim Chart as it is submitted to support the new facts alleged in the Trustee's Answering Brief.

Neither will I consider the First Day Declaration. In the Background section of the Complaints, I am apprised that some information in the Complaints is "discussed more fully" in the First Day Declaration which is "incorporated herein by reference."[70] Assuming one should incorporate another document in a complaint, it is unhelpful to incorporate the entire document rather than the specific relevant paragraphs. Here, fully half of the First Day Declaration is devoted to facts related to first day motions that do not appear to be

---

on multiple occasions and to the point where billions of dollars were invested in the company.
Hr'g Tr. 57:24-58:5.

[69] Each Complaint attached a document as Exhibit A that detailed the challenged transfers for each Defendant, including the nature, amount and source of the payment as well as the date of payment. *See* Complaint Ex. A.

[70] Complaint ¶ 11. In like fashion, I am informed that I can find "more information" on the Debtors' cash management system in the Debtors' Motion (I) to Continue to Use Existing Cash Management System, Including Maintenance of Existing Investment Accounts, Bank Accounts, Checks and Business Form, (II) Waiver of Certain Requirements of the United States Trustee, and (III) for Extension of Time to Comply with Section 345 of the Bankruptcy Code. Complaint ¶ 2 n.2. I have not considered this motion either.

germane to these adversary proceedings. Moreover, wholesale incorporation can also lead

to the incorporation of facts that contradict allegations in the body of the Complaints.[71]

I also decline to consider the voluntary petition.[72] The Trustee first requested that I

take judicial notice of the petition at oral argument.[73] The Trustee argued that I could take

---

[71] For instance, contrary to assertions in the Complaints that F-Squared was "no longer a viable business" or any argument that F-Squared's business was itself illegal, the First Day Declaration clearly contemplates that the company expected to continue its business and provide uninterrupted service to its clients. *See, e.g.,* First Day Declaration ¶ 6; ¶ 38. Similarly, the First Day Declaration states that Debtors' most significant categories of claims are (i) an indemnification claim of Howard Present, (ii) Debtors' lease obligations of $2.7 million per year; and (iii) severance obligations of $1.3 million. *Id.* at ¶¶ 19, 21, 22. There is no mention of customer indemnification claims based on F-Squared's fraud. The First Day Declaration, thus, suggests such liabilities, to the extent they exist (which is not suggested), are not significant, and certainly not "massive."

I am not sure what reasonable inferences I should draw from contradictory facts. The Trustee's counsel essentially suggested that I must ignore any "bad" facts, as I must draw all reasonable inferences in favor of the Trustee.

> MR. MOXLEY: No, Judge, you just have -- the court has -- respectfully, the court just has to read all of those allegations and all of those pieces of information in a light most favorable to the trustee. That's what the stand[ard] is, Judge.
> THE COURT: I don't -- maybe I don't understand how I can apply that standard when -- if the trustee pled in its complaint the sky is blue in paragraph three and then in paragraph four, he pled the sky is red. What inference do I draw from those facts?
> MR. MOXLEY: Well, the -- what the Hornbook law is, is that you would read those allegations in the light most favorable on that particular motion. And so if there are contradictory allegations and one of the allegation allows the trustee to survive the motion and another allegation allows the trustee to not survive the motion, I would submit to you that you'd have to read the allegations together in a light most favorable and so, you would read them in a way that allows the complaint to survive.

Hr'g Tr. 70:10-71:3. This is clearly not the case. For example, the Third Circuit has instructed that where a document attached to or relied upon in a complaint contradicts the allegations therein, the document controls. *Vorchheimer v. Philadelphian Owners Ass'n,* 903 F.3d 100, 111–12 (3d Cir. 2018) ("As exhibits to her own complaint, these materials were appropriate to consider on a motion to dismiss. They do not require going 'outside the pleadings.' And if her own exhibits contradict her allegations in the complaint, the exhibits control.") (internal citations omitted). Contradictory allegations in a complaint, therefore, may mean I can draw no reasonable inference.

[72] *See* Hr'g Tr. 53:16-18, 61:18-22. At argument, I suggested that I would consider the petition as no one objected. Hr'g Tr. 127:13-17. Upon reflection, as I write this section of the Opinion, I do not think this is appropriate for the multiple reasons discussed in the text. But, even if I were to consider it, it would not change my conclusions. *See* discussion *infra* note 129.

[73] *See* Hr'g Tr. 36:25-37:23. A court can take judicial notice of adjudicative facts pursuant to Federal Rule of Evidence 201. Query whether a petition contains adjudicative facts?

judicial notice of the petition because "the petition is a document that's filed in the bankruptcy proceedings." While it is true that in considering a motion to dismiss, a court can take judicial notice of public documents,[74] including filings in a bankruptcy case, the request cannot be made during argument on the motion to dismiss. While Federal Rule of Evidence 201 does not specify any formal requirements for a request for judicial notice, general considerations of due process suggest that the request should be in writing, or made in some way so as to give the adverse party notice and an opportunity to challenge the propriety of the request.[75] Further, the Trustee did not supply me with a copy of the petition, or even indicate which of Debtors' nine petitions he was referring to, an important consideration given there are transfers from two separate Debtors and the Trustee is using the term "F-Squared" collectively to mean all filing entities.[76]

As for Defendants, the Passive Investors attached the Transfer Order to their Motion to Dismiss. I will consider the Transfer Order as it was referenced and relied upon by the Trustee in the Complaints.[77] But, I will consider it only with respect to statements a party has called to my attention in the briefing or at argument. The New Jersey Defendants ask me to consider Debtors' objections to certain of the proofs of claims on the Proof of Claim Chart.[78] Similarly, the McClelland Defendants ask me to consider the dismissals of certain

---

[74] *LKQ Corp. v. United States Dep't of Homeland Sec.*, 369 F. Supp. 3d 577 (D. Del. 2019) (quoting *Mayer v. Belichick*, 605 F.3d 223, 230 (3d Cir. 2010) (emphasis added)) ("In deciding a Rule 12(b)(6) motion, a court must consider *only* the complaint, exhibits attached to the complaint, matters of public record, as well as undisputed authentic documents if the complainant's claims are based upon these documents.").

[75] 1 *Weinstein's Federal Evidence* § 201.30 [3].

[76] *See, e.g.*, Federal Rule of Evidence 201 (c)(2), which provides that a court "must take judicial notice if a party requests it *and the court is supplied with the necessary information.*" Fed. R. Evid. 201 (emphasis added).

[77] Complaint ¶¶ 15, 18, 22.

[78] New Jersey Defendants Opening Brief ¶ 13 n.3.

of the proofs of claims on the Proof of Claim Chart.[79]  Because I am not considering the

Proof of Claim Chart, or any reference to claims filed against the estate, I need not consider

Debtors' objections to, or the dismissal of, those proofs of claim.

In summary, I will consider the facts alleged in the Complaints, Exhibit A to each

Complaint and the Transfer Order.  I will not consider any other documents, whether

specifically discussed above or not.  Having determined the scope of the documents I will

consider on these Motions to Dismiss, I turn to the substantive arguments.

## II.    The Trustee Has Not Sufficiently Pled Facts Related to Debtors' Financial Condition on the Dates of the Relevant Transfers.

In the Complaints, the Trustee asserts that the Transfers are constructive fraudulent

conveyances.  A prepetition transfer by a debtor can be avoided and recovered when the

transfer occurred within two years of filing for bankruptcy, the debtor received less than

reasonably equivalent value in exchange for the transfer, and one of the following

conditions is satisfied: (i) the debtor was insolvent at the time of the transfer, or became

insolvent as a result of the transfer, (ii) the debtor had unreasonably small capital at the time

of transfer or as a result of the transfer, or (iii) the debtor intended to incur, or believed it

would incur, debts beyond its ability to pay as those debts become due.[80]  As discussed

below, the Trustee has not pled facts sufficient to show that any of these three conditions is

satisfied.

---

[79]  McClelland Reply Brief 4-6.
[80]  11 U.S.C. § 548 (a)(1)(B).

### A.    The Trustee Has Not Sufficiently Pled Insolvency for Purposes of Section 548 (a)(1)(B)(i).

The Bankruptcy Code defines insolvency as "the financial condition such that the sum of such entity's debts is greater than all of such entity's property, at fair valuation."[81] This standard is commonly called the balance sheet test.[82]  Insolvency is determined at the time of conveyance.[83]  Notwithstanding this definition, the Complaints do not contain any specific allegations regarding Debtors' assets or liabilities at the time of each transfer.  At argument, the Trustee acknowledged as much.[84]  To compensate, the Trustee makes multiple arguments, each of which fail.

As a preliminary matter, the Trustee argues that insolvency is a factual inquiry and therefore inappropriate for consideration on a motion to dismiss.[85]  While it is true that insolvency is a factual inquiry, the Trustee is still required to plead facts from which a court can infer that the debtor was insolvent on the date of each transfer.[86]  That this element of a constructive fraudulent conveyance is a factual question does not excuse a plaintiff from pleading facts; to so conclude would effectively permit a plaintiff to evade the pleading standard.  As Judge Carey recently stated, a complaint's "recitation of the word 'insolvency' is not enough to support a plausible claim under the *Twombly* standard."[87]  To the extent

---

[81] 11 U.S.C. § 101(32).

[82] *In re Opus East, LLC*, 528 B.R. 30, 50 (Bankr. D. Del. 2015), *aff'd sub nom.  In re: Opus East, LLC*, No. 09-12261, 2016 WL 1298965 (D. Del. Mar. 31, 2016), *aff'd sub nom.  In re Opus East LLC*, 698 F. App'x 711 (3d Cir. 2017).

[83] *Mellon Bank, N.A. v. Metro Commc'ns, Inc.*, 945 F.2d 635, 648 (3d Cir. 1991), as amended (Oct. 28, 1991).

[84] Hr'g Tr. 50:8-12.  *See also* Hr'g Tr. 50:19-21; Hr'g Tr. 52:4-21.

[85] Answering Brief ¶ 38.

[86] *In re United Tax Grp., LLC*, No. 14-10486 (LSS), 2016 WL 7235622, at *3 (Bankr. D. Del. Dec. 13, 2016).

[87] *In re Draw Another Circle.*, No. 16-11452 (KJC), 2019 WL 2489654, at *13 (Bankr. D. Del. June 13, 2019).

any cases cited by Plaintiff actually stand for the proposition that a conclusory statement parroting the statute is sufficient to plead insolvency, I respectfully disagree.[88]

Next, the Trustee argues in its Answering Brief that insolvency can be pled without providing balance sheet specifics. This may be true. For example, the Trustee cites cases in which certain courts have cited to facts other than "balance sheet specifics" in denying a motion to dismiss.[89] But, the common thread in those cases is that the complaint states facts that allow the court to draw a reasonable inference of insolvency when read in the light most favorable to the plaintiff.[90] That is not the case here.

---

[88] The Trustee cites several cases in support of this proposition. These decisions do not particularly support the notion that I should not consider whether insolvency has been sufficiently pled. Several of these courts spend time reviewing the factual allegations surrounding insolvency and making a sufficiency determination. *See, e.g., In re DBSI, Inc.*, 445 B.R. 344, 349 (Bankr. D. Del. 2011) (finding that an allegation that the enterprise was a "Ponzi scheme" that was "by definition insolvent during that time, as it was dependent on constant infusions of cash from new investors to satisfy obligations owed to prior ones[]" was sufficient to meet the pleading standard); *In re Green Field Energy Servs., Inc.*, 2015 WL 5146161, at *7 (Bankr. D. Del. Aug. 31, 2015).

[89] *See, e.g., In re Amcad Holdings, LLC*, 579 B.R. 33, 39 (Bankr. D. Del. 2017); *Official Comm. of Unsecured Creditors v. The CIT Grp./Bus. Credit, Inc. (In re Jevic Holding Corp.)*, Adv. No. 08-51903, 2011 WL 4345204, at *9 (Bankr. D. Del. Sept. 15, 2011); *Official Comm. of Unsecured Creditors v. DVI Bus. Credit, Inc. (In re DVI, Inc.)*, 326 B.R. 301, 306–07 (Bankr. D. Del. 2005).

[90] *See, e.g., In re Amcad Holdings, LLC*, 579 B.R. at 40 ("[]Complaint relies on the declaration of the Debtor's president that proper accounting practices would have shown that the Debtor was insolvent during the relevant period. ... Viewed in the light most favorable to the Liquidating Trustee, testimony regarding insolvency from an officer of the Debtor with direct knowledge of its financial position and an explanation of the transactions that led to insolvency are facts that, if taken as true, would demonstrate insolvency.") (internal citations omitted); *In re Troll Commc'ns, LLC*, 385 B.R. 110, 124 (Bankr. D. Del. 2008) ("According to Troll's internal financial statements, as of June 30, 2002, Communications' accounts payable and other liabilities were $12.8 million. The tangible net worth of Communications was valued at a negative $13.1 million. The going concern business qualification given by PWC rendered the company's goodwill valueless, making tangible net worth the guidepost for determining the company's insolvency. By this standard, and by the standard of the company's cash flow, Troll was insolvent on June 30, 2002...."); *In re DVI, Inc.*, 326 B.R. at 307 ("The allegations in the Amended Complaint of REC III's insolvency are sufficiently specific: that REC III did not have sufficient assets to provide equity to DVI BC, that REC III did not have sufficient capital to contribute to the Cash Collateral Accounts as required, and that payments to the Noteholders were made while REC III was insolvent.").

In his Answering Brief, the Trustee sets forth in bold-type print his summary of the relevant allegations in the Complaints:[91]

- F-Squared's revenues were earned predominantly on account of the AlphaSector Indexes (citing to paragraph 17);[92]

- F-Squared had enormous unliquidated liabilities at all relevant times (citing to paragraph 17);

- F-Squared was charged with and admitted to securities fraud (citing to paragraph 15);[93]

- F-Squared paid $35 million to the SEC in December 2014 (citing to paragraphs 15 and 17);

- The SEC also opened investigations into F-Squared clients (citing to paragraph 20);[94]

---

[91] Answering Brief at ¶¶ 15-16.

[92] Paragraph 17 reads in full:

> F-Squared's ability to make its payroll and pay its debts as they came due following the transfer of $35 million to the SEC was limited and depended on continued payment of asset management fees by clients. By 2014, a substantial majority of F-Squared's revenues, however, were on account of fees paid by F-Squared's clients to F-Squared to permit them to manage their client investments based on the AlphaSector Indexes. Thus, at all relevant times, F-Squared generated a great majority of its revenue by means of illegal activity almost certain to give rise, at some point, to massive liabilities on account of that activity, and so F-Squared was insolvent from the inception of its use of the AlphaSector Index strategy.

[93] Paragraph 15 reads in full:

> The Securities and Exchange Commission (the "SEC") began an investigation of F-Squared in 2013. On December 22, 2014, F-Squared agreed to resolve an administrative cease-and-desist proceeding brought by the SEC pursuant to Section 203(k) of the Investment Advisers Act ("IAA") and Sections 9(b) and 9(f) of the Investment Company Act ("ICA"). Under the terms of the order enacting this resolution (the "Transfer Order"), the SEC charged, and F-Squared agreed to admit, that F-Squared's performance track record for the period between April 2001 and September 2008 was materially inflated, hypothetical and back-tested. The Transfer Order required F-Squared to pay $30 million in disgorgement to the SEC, as well as a $5 million fine.

[94] Paragraph 20 reads in full:

> The SEC also opened investigations into certain of the Debtors' clients for securities fraud related to their use of the AlphaSector strategy, which gave further incentives for these clients to leave F-Squared. For example, in early May 2015, Virtus Investment Partners, Inc. ("Virtus") terminated its relationship with F-Squared, which had been

- Due to F-Squared's fraud, and because many of them were facing their own SEC investigations and penalties for false advertising, F-Squared's clients fled (citing to paragraphs 18, 19).[95]

The Trustee's summary is accurate. In the cited paragraphs, the Trustee details the securities fraud and certain results from it—namely, the payment of $35 million to the SEC and the loss of clients. But all of these events occurred from December 2014 forward, after almost all of the Transfers were made. More importantly, these allegations do not permit me to draw a reasonable inference that Debtors were insolvent at the time of each transfer. Simply facing liability for securities fraud does not make a company insolvent. And uses of words such as "massive" and "enormous" to describe a company's liabilities are conclusory

---

a sub-advisor on several popular mutual funds from Virtus. Virtus was itself investigated by the SEC, and entered into a settlement with the SEC on November 16, 2015. In August 2016, the SEC announced penalties against another thirteen of F-Squared's clients, including AssetMark, Inc., BB&T Securities, and Ladenburg Thalmann Asset Management. See U.S. Sec. and Exch. Comm'n, Investment Advisers Paying Penalties for Advertising False Performance Claims (Aug. 25, 2016), https://www.sec.gov/news/pressrelease/2016-167.html.

[95] Paragraph 18 reads in full:

Following entry of the Transfer Order, F-Squared's clients stopped using F-Squared's algorithms to manage their assets for several reasons, including:

- The negative publicity resulting from the Transfer Order;
- F-Squared's payment of $35 million to the SEC;
- F-Squared's admission that it had conducted business illegally for many years, including especially the AlphaSector Index, which F-Squared had been selling to substantially all of its clients for years;
- The realization of clients using the AlphaSector Index that they themselves might incur liability to their own clients if they continued doing business with F-Squared; and
- The SEC's commencement of investigative enforcement proceedings against several F-Squared clients relating to their business dealings with F-Squared.

Paragraph 19 reads in full:

As a result, F-Squared's revenues dropped precipitously. For example, by March 31, 2015, four of its largest clients notified F-Squared that they were terminating their relationships, representing a loss of $4.3 billion, more than 25% of assets under management. Thereafter, F-Squared's clients continued to flee.

in nature and say nothing regarding the actual magnitude of the liabilities much less the magnitude relative to the company's assets.

The Trustee's primary argument in response to the Motions to Dismiss is that the Complaints contain sufficient allegations from which I can conclude that Debtors were "insolvent from inception" and therefore insolvent on the date of each transfer.[96] In paragraph 17 of the Complaints, the Trustee specifically alleges that: "at all relevant times, F-Squared generated a great majority of its revenue by means of illegal activity almost certain to give rise, at some point, to massive liabilities on account of that activity, and so F-Squared was insolvent form the inception of its use of the AlphaSector Index strategy." Many Defendants argue in their Motions to Dismiss that this language invokes the pleading standard applied by some courts in addressing complaints alleging Ponzi schemes (i.e., a presumption of fraud).[97] In his Answering Brief, the Trustee acknowledges both that his theory applies in Ponzi scheme cases, and that he is not alleging that F-Squared was engaged in a Ponzi scheme. Nonetheless, he argues that "even where a debtor does not operate a Ponzi scheme, a debtor's pervasive illegal activity can result in a debtor's insolvency due to substantial liabilities on account of that illegal activity."[98] The Trustee further contends that the fact that the fraud was the advertising of the product—as opposed to illegal operations—makes no difference. He states: the "use of [the AlphaSector] technology constituted securities fraud because of how it had chosen to advertise it."[99] Applying the Ponzi scheme theory here, the Trustee reasons that because Debtors engaged

---

[96] Complaint ¶ 17. At argument, the Trustee explained his position is that Debtors were insolvent since 2008 when they started using the AlphaSector Index. Hr'g Tr. 85:16-23.

[97] *See, e.g.*, McClelland Opening Brief 9-11.

[98] Answering Brief ¶ 51 n. 9.

[99] Answering Brief ¶ 51, citing to the Complaint ¶ 14.

in securities fraud, Debtors were accruing liabilities due to that fraud at the time the fraud

occurred (i.e., each time it advertised), and that these liabilities were large enough (i.e.

"massive") so that they outweighed Debtors' assets.[100]

This case is sufficiently distinct from a Ponzi scheme case that I will not import any

Ponzi scheme standard into this decision on the Motions to Dismiss.[101] A Ponzi scheme

presents a very specific scenario: guaranteed returns to existing investors can only be paid

with funds from new investors.[102] Certain courts conclude that an allegation that a business

constitutes a Ponzi scheme sufficiently alleges insolvency under the balance sheet test and

section 548, as "[t]he promised rate of return renders a Ponzi scheme operator insolvent

from the scheme's inception, because the returns exceed any legitimate investments."[103]

Here, there is no allegation that Debtors' operations (as opposed to its advertising) were

illegal, that Debtors (or their clients using the AlphaSector Indexes) were  placing

customers' funds in illegitimate investment vehicles or even that persons using the

AlphaSector Indexes strategy were making losing investments.  As Defendants contend,

Debtors operated an otherwise legitimate business.  Indeed, the SEC found that although

F- Squared's investment strategy underperformed advertised results, it outperformed the

S&P 500 Index for the period of April 1, 2001 through August 24, 2008.[104] And, the SEC

did not shut down F-Squared.  Rather, it imposed a fine and certain undertakings, including

---

[100] *Id.*

[101] I also make no comment on whether the presumption of insolvency is appropriately applied in Ponzi scheme cases.

[102] *See Cunningham v. Brown*, 265 U.S. 1, 8 (1924) (describing Charles Ponzi as "always insolvent, and became daily more so, the more his business succeeded.  He made no investments of any kind, so that all the money he had at any time was solely the result of loans by his dupes.").

[103] *See In re Taubman*, 160 B.R. 964, 978 (Bankr.S.D.Ohio 1993) (citing *Cunningham v. Brown*, 265 U.S. 1, 7 (1924)) ("The promised rate of return renders a Ponzi scheme operator insolvent from the scheme's inception, because the returns exceed any legitimate investments.").

[104] Transfer Order 2.

that F-Squared continue to retain an independent compliance consultant with a period of engagement of not less than two years.[105]

Even assuming, therefore, that the existence of a Ponzi scheme is sufficient to infer the insolvency of the operator of that scheme, it is not sufficient on the facts alleged in the Complaints. Rather, the degree to which business activities constitute illegal activities, or the type of activity itself, determines the factual allegations that are required to make a plausible claim of "insolvency from inception." Such allegations are not present here, and a Ponzi scheme cannot be pled here.

Further, the Trustee's reliance on *Coated Sales*[106] and *Antar*[107] do not otherwise persuade me that the Trustee has alleged sufficient facts in the Complaints to permit me to draw a reasonable inference that Debtors were insolvent on the date of each transfer. In *Coated Sales*, the debtor's officers perpetrated a "massive fraud involving fictitious invoice billings, false account receivable, false customer audit confirmations and nonexisting inventory records" for which these officers were subsequently indicted on charges of bank fraud, securities fraud, racketeering and money laundering.[108] Among the litigation brought in the ensuring bankruptcy case were various preference actions which necessitated a determination of whether Coated Sales was insolvent on the applicable transfer dates.[109] At trial, the court heard competing valuation testimony. As a preliminary matter the court considered whether it should value the company as a going concern or on a liquidation basis.[110] In this context, the court said it could consider information (i.e., the fraud) learned

---

[105] Transfer Order 11-12.
[106] *In re Coated Sales, Inc.*, 144 B.R. 663 (Bankr. S.D.N.Y. 1992).
[107] *S.E.C. v. Antar*, 120 F. Supp. 2d 431 (D.N.J. 2000), *aff'd* 44 F. App'x 548 (3d Cir. 2002).
[108] *Coated Sales*, 144 B.R. at 665.
[109] *Id.* at 667.
[110] *Id.* at 667-8.

after the challenged transfers to determine whether the company was insolvent on the transfer dates.[111] The *Coated Sales* court explained that a court may use such after-the-fact information if it "tends to shed light on a fair and accurate assessment of the asset or liability as of the pertinent date . . . ."[112] Ultimately, the court did not need to choose between a liquidation and a going concern valuation methodology because after adjustments to the balance sheet the debtor was insolvent under either methodology.[113] Thus, to the extent the court even considered the fraud in its decision, the court considered it in the context of assets and liabilities and the adjustments to the debtor's balance sheet.

In *Antar*, the SEC sued Antar to set aside certain transfers under New Jersey's Uniform Fraudulent Transfer Act.[114] The transfers occurred in 1991 and 1997.[115] In determining whether Antar was insolvent at the time of the transfers the court considered its previous decision, in which it ruled that Antar had committed securities fraud in the 1980s and awarded the SEC $15 million based on illegal profits plus prejudgment interest in the amount of $42 million.[116] The court included the SEC's claim as a debt in its solvency analysis concluding that the SEC had an unliquidated claim for the securities fraud at the time of the 1991 and 1997 transfers. The court stated that the fact that the SEC's claim had not yet been reduced to judgment at as of the time of the transfers did not undermine the determination of insolvency.[117] Comparing Antar's net worth of between $6 million to $8

---

[111] *Id.* at 668.

[112] *Id.*

[113] *Id.* at 679 ("Taking into consideration the adjustments that the Court feels were necessary and reasonable under the circumstances, the Court finds that, irrespective of the valuation method applied, CSI was insolvent at the time of the transfer.").

[114] *Antar*, 120 F. Supp. 2d at 436.

[115] *Id.* at 442.

[116] *Id.* at 443.

[117] *Id.*

million as of the date of the transfers to the amount of the subsequent $15 million award for securities fraud, the court easily concluded that Antar's "debts dwarfed any conceivable valuation of his assets in 1991 and 1997."[118]  Both the *Antar* court and the *Coated Sales* court were willing, to some degree, to consider after-the-fact information in determining the solvency of the debtor.[119]

Defendants contend that in relying on *Coated Sales* and *Antar,* the Trustee is confusing the use of later-learned information and employing impermissible hindsight. Defendants contend that the Trustee's arguments rely on many contingencies, which were not certainties at the time of each transfer, including that F-Squared's misconduct would have been discovered and not timely corrected, that the SEC would use its discretion to bring an enforcement action against F-Squared, that the SEC would then use its further discretion to take action against F-Squared's customers and that F-Squared's customers would have indemnification claims against F-Squared.  Defendants cite to *Edgewater Medical Center*[120] to prove their point.

In *Edgewater Medical*, a chapter 11 debtor brought a fraudulent conveyance and breach of fiduciary duty lawsuit against a landlord and their common principal.[121]  The court had previously determined after trial that the debtor was engaged in Medicare fraud, and the plaintiff argued that this fraud should be taken into account in the solvency

---

[118] *Id.*

[119] I focus on *Antar* and *Coated Sales,* as these are the cases the parties focused on in argument.  In his Answering Brief, the Trustee spends considerable time discussing *W.R. Grace & Co.,* 281 B.R. 852 (Bankr. D. Del. 2002).  The *W.R. Grace* decision spends significant time discussing the treatment of contingent claims and unknown claims in a solvency analysis, and also tries to reconcile and/or distinguish the different and varying contexts in which courts consider and/or condemn the use of hindsight.  Nothing in *W.R. Grace,* however, supports the Trustee's position that a court should inject into its analysis an unknown, massive figure in lieu of a liquidated debt.

[120] *In re Edgewater Med.Ctr.,* 373 B.R. 845 (Bankr. N. D. Ill. 2007).

[121] *Id.* at 852.

analysis.[122]  At trial on the fraudulent conveyance action, the plaintiff adduced credible

expert testimony on the actions the Department of Health and Human Services would have

taken if it had discovered the fraud and the effect of those actions on the solvency of the

debtor.[123]  As the court stated, if the effect of the Medicare fraud was included in the

solvency analysis, the debtor was insolvent; if not, the debtor was solvent.[124]  The *Edgewater*

*Medical* court declined to speculate regarding what would have happened if the fraud had

been discovered prior to the transfers and concluded that the plaintiff had not met its burden

of proving insolvency.[125]  In so doing, it distinguished *Coated Sales* noting that in *Coated Sales*,

the debtor was actually insolvent, but only appeared to be solvent because it was "cooking

the books."[126]  The court observed that in *Coated Sales*, the court did not need to incorporate

hypothetical fines, penalties or uncollectible accounts receivable due to fraud as the debtor

was actually insolvent without accounting for the fraud.[127]

　　　Here, I need not decide whether the Trustee's request asks me to employ

impermissible hindsight.  Assuming, *arguendo*, I should consider events subsequent to

---

[122]  *Id.* at 853-4.

[123]  *Id.* at 854.

[124]  *Id.*

[125]  The *Edgewater* Court explained:

> Had the government discovered the Medicare fraud that was occurring and had the government completely ceased making payments to the debtor, then perhaps the debtor would have been rendered insolvent. Perhaps that is what would have happened; perhaps that is even what *likely* would have happened.  To reach a finding of insolvency, however, the court would have to disregard the large amounts of cash the debtor had on hand and speculate on what the Department of Human Services would have done if it had discovered the Medicare fraud.  The court declines to engage in that type of speculation and finds and concludes that the plaintiff has not met its burden of proving insolvency.

*Id.* at 855.

[126]  *Id.* at 854-5.

[127]  *Id.* (citing to *Coated Sales*, 144 B.R. at 679).

F- Squared's transfers in connection with a solvency analysis, the reasonable inferences to

be drawn in the Trustee's favor still do not result in a plausible case of insolvency.  Applying

*Antar* and *Coated Sales* here, I would draw a reasonable inference from the Complaints and

the Transfer Order that on the date of each transfer that occurred prior to the Transfer

Order, the SEC had a claim against F-Squared in the amount of $35 million on account of

F-Squared's false advertising.  But from this, I cannot draw the further requested inference

that F-Squared was insolvent on each of those dates, primarily because the Trustee did not

plead any facts regarding F-Squared's assets on those dates.  As Defendants point out, the

reasonable inference to draw from the facts pled in the Complaints is that: (i) F-Squared was

profitable as it was making tax and profit distributions through 2014; and (ii) as of June 20,

2014, there were $28.5 billion in assets under advisement.[128]  From the facts pled, I cannot

make the inferential leap the Trustee seeks, namely that F-Squared's "massive liabilities"

always outweighed its assets.  The same holds true with respect to Transfers made after the

Transfer Order.  Even though there is an established liability, I have no asset information to

compare it to.[129]

Further, on the facts pled and the law cited, I reject the Trustee's suggestion that I

accept *Antar*'s conclusion and consider later-learned facts, but ignore those facts to the

---

[128] Complaint ¶ 14.

[129] If I were to consider the petition as a reference point, I would not conclude any differently.  The
Trustee argues that the petition shows assets of between $1 and $10 million as of the petition date
and I should therefore value F-Squared's assets at $1 million as of the date of each transfer.  Even
giving the Trustee every reasonable inference, the $1 million value is after the payment of the SEC
fine, disgorgement of profits and loss of clients.  Hr'g Tr. 36:23-38:17.  Importing a $1 million asset
value (or fair market value?) appears more akin to employing impermissible hindsight than an after-
the-transfer fact which permits a court to better assess the true value of an asset or liability at a
previous point in time.  Unlike F-Squared's false advertising, the loss of clients is not an established
fact that existed at the date of each transfer.  This argument requires predicting that the SEC would
not only investigate and threaten to prosecute Debtors, but that the SEC would choose to investigate
and threaten to prosecute Debtors' customers.

extent they do not support the Trustee's position. Here, the Trustee asks me to acknowledge debt existing at the time of each transfer based on F-Squared's entry into the Transfer Order, but to ignore the liquidation of that debt at $35 million. The Trustee asks that I conclude that F-Squared's debt at the time of the transfer was some unknown, but "massive" number presumably far in excess of $35 million.[130] Nothing in *Antar* suggests that in drawing reasonable inferences I should forego acknowledging a subsequently liquidated amount in favor of a wholly speculative or potential figure. The only reasonable inference I can draw from the facts alleged seen through the prism of *Antar* is that F-Squared's debt for securities violations at the time of each Transfer was $35 million.

Finally, that F-Squared was insolvent from the first instance that it put out any advertisement that violated securities laws is simply not a reasonable inference. The Trustee provides no facts that show that Debtors would be liable for the full amount of any debt to the SEC at the instance of the first securities law violation in 2008, or that the AlphaSector Index constituted the largest portion of Debtors' revenue from the beginning. To the contrary, the Transfer Order states that the violations occurred *over a period of time* between 2008 and 2013. Further, the only timing allegation in the Complaints is inconsistent with a theory of "insolvency from the inception" as the Trustee alleges that *"[a]s a result of the Transfer Order*, F-Squared was no longer a viable business and was no longer able to operate with its remaining capital." The Transfer Order is dated December 22, 2014. Therefore, "insolvency from inception" is not a plausible, viable theory of insolvency based on the allegations pled here and is insufficient to meet the pleading standard.

---

[130] Hr'g Tr. 34:11-45.

Because I can draw no reasonable inferences as to assets or the magnitude of liabilities relative to assets from the facts alleged in the Complaints, and because I do not find the "insolvency from inception" theory to be based in the facts alleged, I cannot reasonably infer insolvency.

**B.    The Trustee Has Not Adequately Pled Unreasonably Small Capital.**

Even if the Trustee has not sufficiently pled insolvency, he may defeat the Motions to Dismiss if he has adequately pled that Debtors had unreasonably small capital at the time of each Transfer.  Count I of the Complaints asserts this action under the Bankruptcy Code. Count II of the Complaints asserts this action under both Massachusetts and Delaware state law imported through § 544(b) of the Bankruptcy Code.

The briefing on undercapitalization was meager, to say the least.  And, in many of Defendants' Opening Briefs and the Answering Brief, there is overlap between the discussion of insolvency and the discussion of undercapitalization.  Defendants' arguments can generally be classified in three categories: (i) the Trustee has simply not pled sufficient facts to show that there was inadequate capitalization at any time; (ii) the Trustee has not pled sufficient facts to show that the Transfers caused undercapitalization, or that the Transfers were of a magnitude that could have caused inadequate capitalization; and (iii) the Trustee has not, and cannot, plead undercapitalization without use of impermissible hindsight.

The Trustee's one sentence response in his Answering Brief points to three paragraphs of the Complaints,[131] which the Trustee cites for the proposition that: "Even though F-Squared generated large quantities of cash during and after its fraudulent

---

[131]  Complaint ¶¶ 19, 21, 28.

advertising campaign, this cash flow slowed to a trickle once F-Squared admitted to its fraud, and the company used much of the cash it had in its coffers to make the Transfers."[132] The remainder of the Trustee's briefing reprises his impermissible hindsight/later-learned information distinction.[133]

The Bankruptcy Code test is whether the debtor was "engaged in business or a transaction, or was about to engage in business or a transaction, for which any property remaining with the debtor was an unreasonably small capital."[134]  The state law standards are similar to the bankruptcy law standard.  Massachusetts General Law 109A, section 5 states, in relevant part, that a transfer is fraudulent where given "without receiving a reasonably equivalent value in exchange for the transfer or obligation, and the debtor: (i) was engaged or was about to engage in a business or a transaction for which the remaining assets of the debtor were unreasonably small in relation to the business or transaction[.]"[135]

---

[132] The full text of paragraph 19 is recited *supra*, in note 95.  Paragraph 21 reads in full:
> In response to this substantial loss of business, in March 2015 the Debtors reduced their workforce by nearly 30% - from 162 to 117 employees.  The work force reduction resulted in the incurrence of an additional approximately $1.3 million in severance costs.  Moreover, in connection with the SEC's investigations, F-Squared incurred approximately $17.2 million in direct legal costs, plus millions more advanced to Directors and Officers pre-petition relating to the investigation, of which only $10 million of which was recovered from available insurance.

Paragraph 28 reads in full:
> During the two years prior to the Petition Date, F-Squared distributed certain Dividends to Defendant in the amount set forth in Exhibit A to pay Defendant's personal income taxes related to Defendant's equity interest in F-Squared and/or as profit interests in F-Squared."  I note that none of these paragraphs contain an allegation that supports the assertion that F-Squared used "much of the cash in its coffers.

[133] Answering Brief ¶ 54 (citing to *Adelphia Recovery Tr. v. FPL Grp.* (*In re Adelphia Commc'ns Corp.*), 512 B.R. 447, 495 (Bankr. S.D.N.Y. 2014) ("*Adelphia*").  It is unclear that this argument addresses undercapitalization as the Trustee uses the term insolvency during the entirety of this argument.  Regardless, I will treat it as such.

[134] 11 U.S.C. § 548 (a)(1)(B)(ii)(II).

[135] Mass. Gen. Laws ch. 109A.

Delaware Uniform Fraudulent Transfer Act § 1304(a)(2) uses the same language.[136]  No party briefed the standard under state law or distinguished it from the § 548 standard.  Like the parties, I will cite to caselaw interpreting § 548.

Undercapitalization is a distinct concept from insolvency.  A debtor has unreasonably small capital if it has an "inability to generate sufficient profits to sustain operations[,]" at the time of or because of the challenged transfer[137] or, in other words, where a debtor is "technically solvent but doomed to fail."[138]  The standard is reasonable foreseeability.[139]  In applying this standard, courts have considered a debtor's assets and liabilities, cash flow, revenue generating assets, access to capital, debt to equity ratio and capital cushion.[140]  To "strike a proper balance" under the "reasonable foreseeability" test, courts must "take[ ] into account that 'businesses fail for all sorts of reasons, and that fraudulent [conveyance] laws are not a panacea for all such failures.'"[141]

For similar reasons to those set forth above regarding insolvency, the Trustee fails to plead unreasonably small capital.  There are simply insufficient facts in the Complaints to

---

[136] Del. Code Ann. tit. 6, § 1304 (a)(2).

[137] *Moody v. Sec. Pac. Bus. Credit, Inc.*, 971 F.2d 1056, 1070 (3d Cir. 1992).

[138] *MFS/Sun Life Tr.–High Yield Series v. Van Dusen Airport Servs. Co.*, 910 F.Supp. 913, 944 (S.D.N.Y. 1995) (citing *Moody*, 971 F.2d at 1070 & n.22).

[139] *In re Semcrude, L.P.*, 526 B.R. 556, 560 (D. Del. 2014) (citing to *Moody*, 971 F.2d at 1073), *aff'd sub nom. In re SemCrude L.P.*, 648 F. App'x 205 (3d Cir. 2016).

[140] *In re 45 John Lofts, LLC*, 599 B.R. 730, 746 (Bankr. S.D.N.Y. 2019).  *See also Adelphia*, 512 B.R. at 495-6 ("Courts considering capital adequacy (under state law or Bankruptcy Code section 548, which affords analogous rights of recovery in favor of estate representatives under federal law) have generally considered whether, at the time of the transfer, the company was able to generate sufficient profits or capital to sustain operations over a reasonable period of time.  In doing so, they have considered the reality of the debtor's financial condition leading up to the transfer, looking to such factors as the company's 'debt to equity ratio, its historical capital cushion, and the need for working capital in the specific industry at issue,' as well as 'the debtor's present and prospective debts, and whether the retained assets are sufficiently liquid to enable the debtor to pay such debts as they become due.'  But '[w]hile a company must be adequately capitalized, it does not need resources sufficient to withstand any and all setbacks.'") (citations omitted).

[141] *Moody*, 971 F.2d at 1073.

permit me to draw a reasonable inference that Debtors were undercapitalized at the time of each transfer. The Trustee does not sufficiently allege facts regarding F-Squared's overall assets and liabilities. Neither does he allege facts regarding F-Squared's access to capital, debt to equity ratio or capital cushion. And, because he makes no allegations with respect to the amount of F-Squared's capital, *a fortiori*, the Trustee makes no allegations that F-Squared's assumptions regarding its available capital were unreasonable.

The Trustee does allege that following entry of the Transfer Order, and therefore the payment of the amounts due thereunder, F-Squared lost certain clients. The Trustee pleads that *by March 15, 2015* four of F-Squared's largest clients were terminating their relationship with F-Squared resulting in a loss of more than 25% of assets under management, and that F-Squared was taking measures to reduce its workforce. The Trustee also pleads that *in early May 2015* another client terminated its relationship with F-Squared, and that *in August 2016*, the SEC announce penalties against thirteen of F-Squared's clients. These allegations provide sufficient detail to infer that F-Squared would experience a sharp and significant drop in revenue after it lost these clients, but, without more, they are not sufficient to infer undercapitalization at the time of the challenged transfers. First, the timeframe of the loss of revenue is, at best, March 15, 2015 through August 2016. At most, two sets of transfers were made during this time frame, the Tax Distribution made on March 30, 2015 and the Bonus Payment made on April 15, 2015. All other Transfers predate the loss of clients, some by more than one year. Second, there are no facts alleged regarding F-Squared's capital needs, its monthly liabilities or its outstanding debt to know at what point F-Squared's loss of revenue turns into "an inability to generate sufficient profits to sustain

operations." Notably, there is no allegation that any clients ceased paying fees prior to terminating their contracts.

In his Answering Brief, the Trustee states that "F-Squared was always undercapitalized."[142] This is akin to the allegation F-Squared was insolvent "since the inception," and appears to invoke *Antar* and *Coated Sales.* But, these cases do not persuade me that the Trustee has met the pleading standards. Preliminarily, courts appear to caution even more strongly against the use of impermissible hindsight in an unreasonably small capital analysis because the standard is one of "reasonable foreseeability."[143] More importantly, there is no comparative information against which to gauge the later-learned "fact" of loss of clients and revenue steam. Again, there is no information in the Complaints regarding funds necessary to sustain operations or the level of F-Squared's capital at any point in time.

Further, the Profit Distributions and the Tax Distributions are somewhat unique transfers to evaluate, particularly in the context of an unreasonably small capital analysis. The Profit Distributions and Tax Distributions are made based on F-Squared's profits. As the Trustee observes, the Tax Distributions correspond to the income tax obligations of the recipient on account of his ownership interest in F-Squared equity.[144] So, as revenues decrease, any profit and or tax distributions would decrease as well. Placing revenue loss

---

[142] Answering Brief ¶ 53.
[143] *See Boyer v. Crown Stock Distribution, Inc.*, 587 F.3d 787, 794 (7th Cir. 2009) ("But one has to be careful with a term like "unreasonably small." It is fuzzy, and in danger of being interpreted under the influence of hindsight bias. One is tempted to suppose that because a firm failed it must have been inadequately capitalized. The temptation must be resisted."). *See also W.R. Grace*, 281 B.R. at 852 (comparing an insolvency analysis with an unreasonably small capital analysis and determining that the significant difference between the two was a focus on "reasonableness" in the unreasonably small capital analysis).
[144] *See* Complaint ¶ 9.

back in time, therefore, could eliminate any such transfers. The Trustee does not discuss how an adequate capitalization analysis accounts for this type of transfer.

### C.    The Trustee Has Not Adequately Pled That Debtors Intended to Incur Debts They Could Not Pay.

Finally, to plead a constructive fraudulent conveyance, a plaintiff may allege that at the time of the transfer, the debtor intended to incur or believed that it would incur debts beyond its ability to pay as such debts matured.[145] Count I of the Complaints makes this assertion under the Bankruptcy Code. Count II of the Complaints makes this assertion under Massachusetts and Delaware state law imported through § 544(b) of the Bankruptcy Code. The language of the relevant Massachusetts and Delaware laws are substantially similar to language of § 548.[146] No party briefed the relevant standard. And, the Answering Brief does not even address this aspect of the Motions to Dismiss.

This prong of the constructive fraudulent conveyance standard can be met if it can be shown that the debtor made the transfer "contemporaneous with an intent or belief that subsequent creditors likely would not be paid as their claims matured."[147] Courts have held that intent or belief can be inferred from circumstances showing that the debtor could not reasonably believe that it would be able to repay subsequent debts.[148]

Here, there is only one allegation in the Complaints that relates to this element. The Trustee alleges: "F-Squared's ability to make its payroll and pay debts as they became due following the transfer of $35 million to the SEC was limited and depended on continued

---

[145] 11 U.S.C. 548(a)(1)(B)(ii)(III).
[146] Both require that the debtor "(ii) intended to incur, or believed or reasonably should have believed that he would incur, debts beyond his ability to pay as they became due." Mass. Gen. Laws ch. 109A, § 5, Del. Code Ann. tit. 6, § 1304 (a)(2).
[147] 5 *Collier on Bankruptcy* ¶ 548.05 (16th ed. 2019).
[148] *Id.*

payment of asset management fees by clients."[149]  This allegation merely states that the

ability to pay debts was "limited" and dependent, and does not rise to the level of

"inability."  And, there are no allegations in the Complaints suggesting that the Debtors did

not intend to pay their debts as they came due.  Moreover, certain allegations suggest the

opposite.  The Trustee alleges that "in response to the loss of business, in March 2015, the

Debtors reduced their workforce by nearly 30%."  While the Trustee alleges that the

workforce reduction resulted in additional costs of $1.3 million, the reasonable inference to

draw from this allegation as it relates to this standard is that F-Squared recognized the loss

of revenue and was actively working to reduce its ongoing costs, and thus its future payroll

obligations (although the severance obligation was increased).  Similarly, the Trustee alleges

in Complaints seeking avoidance of Bonus Payments that: "Minutes of F-Squared's April 6

2015 meeting of the Board of Managers note that no bonuses for 2015 were likely to be paid

due to F-Squared's poor financial performance.  Nonetheless, F-Squared made the Bonus

Payments, even though it was in the midst of its death spiral."[150]  The reasonable inference

from this allegation is that management was aware of the need to consider its profitability in

the decision making process; this allegation does not reflect an intent to incur debts that

F- Squared cannot pay.

No facts alleged create a reasonable inference that F-Squared was intending to create

debt it was unable to pay.  And, once again, the timeframe alleged in the Complaints is

December 2014 to March 2015-April 6, 2015, after almost all Transfers were made.

Accordingly, the Trustee has not met the pleading standard.

---

[149]  Complaint ¶ 17.
[150]  Oliveira Complaint ¶ 29, Adv. No. 17-50741.

*Conclusion*

The Trustee has not pled facts sufficient to support a reasonable inference that F-Squared suffered from one of the three financial conditions necessary to plead a constructive fraudulent conveyance. So, the Motions to Dismiss will be granted as to these grounds. I will, however, permit the Trustee to file motions to amend the Complaints with respect to his allegations related to F-Squared's financial condition if he believes it is appropriate.

Orders need to be entered in each adversary proceeding. But, Defendants Eng, Chu, Collins, Dunaway, Gurevich, Miranyan, Miskel, Oliveria, Toso and Yuan raise arguments in their Motions to Dismiss that I have not yet considered. Accordingly, I will be issuing a separate Memorandum in each of those adversary proceedings addressing remaining issues. Thereafter, a joint status conference will be held to address appropriate forms of order in all of the captioned adversary proceedings consistent with my rulings in this Opinion, my previous Opinion and any Memoranda.

Dated: September 6, 2019
Wilmington, Delaware

Laurie Selber Silverstein
United States Bankruptcy Judge